**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Gary Oliver, Scott Wachterhauser, Jennifer Wachterhauser, and Brendan Kane, individually, and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>BLACK BEAR SPORTS GROUP, INC. (d/b/a DEFENDER HOCKEY TOURNAMENTS, TIER 1 HOCKEY FEDERATION, and NATIONAL GIRLS HOCKEY LEAGUE),<br><br>*Defendant.* | Civil Action No. ____________<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs Gary Oliver, Scott Wachterhauser, Jennifer Wachterhauser, and Brendan Kane, on behalf of themselves and all others similarly situated, by and through their attorneys, bring this class action, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all matters against Black Bear Sports Group, Inc. ("Defendant"), for violations of: (1) Delaware Consumer Fraud Act, 6 Del. C. §§ 2511–2527 ("DCFA"); (2) New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.* ("NJ CFA"); (3) New York General Business Law § 349 (Deceptive Acts and Practices) ("NY GBL § 349"); and (4) unjust enrichment, and in support state as follows:

**<u>NATURE OF THE ACTION</u>**

1. Plaintiffs bring this action to challenge Defendant's deceptive, unconscionable, and unfair practice of coercing parents into complying with Defendant's "Stay to Play" policy in connection with hockey tournaments it operates under the brand names Defender Hockey Tournaments, Tier 1 Hockey Federation, and National Girls Hockey League.

2. "Stay to Play" refers to the requirement that families stay in particular hotels and book hotel reservations through a specific platform in order for their children to participate in sports events.

3. Stay to Play policies are among the practices challenged by the Let Kids Play Act, a federal bill that was introduced to combat private equity firms' involvement in youth sports and "vulture practices," including "requiring that families stay at specific hotels for kids sports tournaments[.]"[1]

4. Defendant, a for-profit company founded by a private equity veteran, engages in numerous vulture practices and has been specifically called out for its deceptive, unfair, and abusive conduct in discussions regarding the Let Kids Play Act,[2] but the focus of this Complaint is limited to: (a) Defendant's utilization of an unfair Stay to Play policy in connection with tournaments and events; (b) Defendant's material misrepresentations and omissions related to its Stay to Play policy; and (c) Defendant's practice of tacking on junk fees[3] in connection with its Stay to Play policy.

---

[1] S. 4522, 119th Cong. § 2 (2026). The Let Kids Play Act was introduced on May 13, 2026, by Senator Chris Murphy (D-Connecticut) and Representative Chris Deluzio (D-Pennsylvania). Stephen Borelli, *Bill seeks to end 'vulture practices' in kids sports: What it means*, USA Today (May 13, 2026), https://www.usatoday.com/story/sports/2026/05/13/let-kids-play-act-vulture-practices-youth-sports-explainer/90069811007 (last visited July 22, 2026).

[2] *See, e.g.*, https://youthsportsbusinessreport.com/let-kids-play-act-targets-private-equity-ownership-of-youth-sports-teams-leagues-and-facilities (last visited Aug. 10, 2026).

[3] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer." Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), available at https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-feestrade-regulation-rule-commission-matter-no-r207011 [https://perma.cc/2NKH-M3DJ] (cleaned up).

5. Defendant falsely tells hockey parents that, without exception, they must make hotel reservations in particular partner hotels via an affiliated platform in order for their children to participate in tournaments and events, thereby leading consumers to believe that they have no choice but to stay where Defendant tells them to stay and make reservations through Defendant's partner booking platform.

6. In reality, not every player from each team is required to comply with Defendant's Stay to Play policy and there is a "buyout fee" option for parents who would rather not stay in the hotels that partner with Defendant. Defendant conceals or omits these material facts to deceptively induce parents to stay in specified hotels and make reservations through an affiliated platform.

7. This arrangement benefits Defendant's bottom line and harms consumers. Defendant receives kickbacks from its partner hotels, and as set forth in detail below, parents pay inflated rates to stay in the hotels that partner with Defendants. Defendant knows that Stay to Play policies increase the cost of tournament and event participation for families.

8. Defendant also adds unavoidable fees to each reservation that have little or no added value to hockey parents. To make matters worse, Defendant does not disclose these added fees to consumers. As detailed below, Defendant charges one "non-refundable fee" with no explanation of what parents may receive in exchange for this fee. Defendant also charges parents a second, more significant fee for making the reservation that Defendant tricked them into making. These fees are listed as simply "Charged Now" on the line-item rate summary that hockey parents receive on their booking confirmation emails.

9. Plaintiffs bring this action to provide a remedy to the thousands, if not millions, of families across the United States who have been harmed by Defendant's unlawful practices.

**PARTIES, JURISDICTION, AND VENUE**

10. Plaintiff Gary Oliver is an individual citizen of the State of Delaware.

11. Plaintiffs Scott Wachterhauser and Jennifer Wachterhauser are individual citizens of the State of New Jersey.

12. Plaintiff Brendan Kane is an individual citizen of the State of New York.

13. Defendant Black Bear Sports Group, Inc. is a Delaware corporation. Defendant is headquartered at 1100 International Parkway, Sunrise, FL 33323, Florida, but it does not operate any ice arenas or hockey tournaments in Florida.

14. Defendant owns and operates the Patriot Ice Center in Delaware.

15. Defendant has hosted at least 19 hockey tournaments in the State of Delaware.

16. Defendant is scheduled to host the "President's Cup" the weekend of February 13-15, 2027, at the Patriot Ice Center in Delaware and Ice World Maryland, another ice arena owned by Defendant.

17. Defendant owns, manages, and operates 47 ice rinks in Connecticut, Delaware, Illinois, Maryland, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, and Rhode Island. Through its brand names Defender Hockey Tournaments ("Defender"), Tier 1 Hockey Federation league ("THF") and National Girls Hockey League ("NGHL"), Defendant operates Stay to Play hockey tournaments and events throughout the mid-Atlantic, Northeast, and Midwest, including in Delaware, New Jersey, New York, Connecticut, Massachusetts, Pennsylvania, Michigan, and Illinois (collectively, "Tournaments at Issue").

18. Jurisdiction is proper in this district as many of the alleged violations occurred in this district, Defendant is incorporated in this district, Plaintiff Gary Oliver resides in this district,

and Defendant purposefully avails itself of the laws, protections, and advantages of doing business in Delaware by operating an arena and tournaments in Delaware.

19. This Court has original jurisdiction over the action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interests and costs, and at least one member of a proposed class is a citizen of a different state than Defendant.

20. Venue is proper because a significant portion of the events alleged herein occurred within this district.

## PLAINTIFFS' ALLEGATIONS

### A. Youth Sports Inflation Is "Out of Control."

21. Youth sports in the United States have become big business. The estimated annual revenue of the youth sports sector ballooned to $40 billion in 2025, more than the annual revenue of the NFL and NBA combined.[4]

22. Parents are feeling the pinch. According to a survey conducted by the Aspen Institute's Sports and Society Program in partnership with Utah State University and Louisiana Tech University (the "Aspen Survey"), family spending on youth sports increased 46 percent from 2019 to 2024, twice the rate of price inflation in the broader economy during the same period.[5] The average family paid nearly $1,500 for one child's sports experiences in 2024, and the cost for

---

[4] Todd C. Frankel, *The Soaring Price of Youth Sports: $50 to Try Out, $3,000 to Play*, Wash. Post (Jan. 7, 2026), https://www.washingtonpost.com/business/2026/01/07/youth-sports-cost-parents-investors-profit (last visited Feb. 25, 2026).

[5] Jon Soloman, *Project Play survey: Family spending on youth sports rises 46% over five years*, Aspen Institute (March 3, 2025), https://projectplay.org/news/2025/2/24/project-play-survey-family-spending-on-youth-sports-rises-46-over-five-years (last visited Feb. 25, 2026).

families with more than one child participating in a sport was undoubtedly higher.[6] Nearly 60 percent of parents described youth sports as a financial strain according to a 2022 Lending Tree survey.[7]

23. The Aspen Survey noted that increased spending on travel and lodging for non-local play was among the factors that drove up the overall costs of youth sports.[8]

24. The dramatic increase in costs has led to a widening income gap in youth travel sports. Youth players from households earning $100,000 or more per year are two times more likely to play travel sports than those from homes making under $50,000.[9]

25. According to Tom Farrey, executive director of Aspen's Sports & Society Program, "Youth sports inflation is out of control and no segment of the population is untouched."[10]

**B. Defendant Engages in "Vulture Practices" that Exploit Parents and Increase Costs.**

26. Defendant is the largest owner-operator of hockey rinks in the country and has garnered attention from national news outlets for its practice of acquiring ice rinks, inflating ice rental costs, pushing out community-based nonprofit hockey clubs, and extracting as much money as possible from hockey parents.

27. For example, Defendant and Murry Gunty, its founder and longtime CEO, were the subject of a USA Today expose titled "Lord of the Rinks. Meet the hockey CEO cashing in on your kid's team,"[11] and a Wall Street Journal video titled "The Big Business Buying Up America's

---

[6] *Id.*
[7] Frankel, *supra* note 4.
[8] Soloman, *supra* note 5.
[9] Aspen Institute, *Participation Trends*, https://projectplay.org/state-of-play-2025/participation-trends#5 (last visited Feb. 25, 2026).
[10] Soloman, *supra* note 5.
[11] Kenny Jacoby, *Lord of the Rinks. Meet the hockey CEO cashing in on your kid's team*, USA Today (May 7, 2026), https://www.usatoday.com/story/news/investigations/2026/05/07/lord-of-the-rinks-black-bear-youth-hockey/89503875007 (last visited Aug. 8, 2026).

Hockey Rinks,"[12] which chronicled Defendant's meteoric rise and devastating impact on grassroots hockey organizations.

28. Defendant has acquired 47 ice arenas[13] since it was founded by Gunty in 2015.[14]

29. Owning and operating the arenas is just the beginning of Defendant's business strategy, which monetizes youth hockey in every imaginable way. According to the Wall Street Journal, Defendant's income streams stem from renting out ice rinks, running its own hockey clubs, tournaments and clinics, getting kickbacks from a uniform store that makes its jerseys, selling a subscription based streaming service for as much as $37.00 per month—so that parents can pay to watch their own kids play hockey for a fee—and receiving sponsorship deals through branding opportunities.[15]

30. As Senator Chris Murphy from Connecticut stated:

> They don't just own the league, they own many of the rinks that the games are played in. Black Bear ownership's roots are in private equity. They see my son's hockey experience as a chance to make a massive amount of money. They aren't trying to optimize the kids' experience or the families' experience. They are using youth sports to get rich.[16]

31. Defendant's business model starts with buying arenas so that it can control the one scarce resource required for hockey: ice.

32. Once Defendant establishes control over the ice, it raises ice rental rates on grassroots, non-profit hockey clubs until they can barely afford to exist. The next step involves

---

[12] *The Big Business Buying Up America's Hockey Rinks*, Wall Street Journal (May 14, 2026), https://www.youtube.com/watch?v=JetP-W5azNA&t=46s (last visited Aug. 8, 2026).
[13] https://blackbearsportsgroup.com/arenas (last visited Aug. 10, 2026).
[14] https://blackbearsportsgroup.com/about (last visited Aug. 10, 2026).
[15] *The Big Business Buying Up America's Hockey Rinks*, Wall Street Journal (May 14, 2026), https://www.youtube.com/watch?v=JetP-W5azNA&t=46s (last visited Aug. 8, 2026).
[16] *Id.*

taking over the local clubs and their teams by offering to buy them for just one dollar. Local clubs that don't accept Defendant's low-ball offer struggle to compete with Defendant's in-house clubs and often fail.[17]

33. In addition to controlling the ice, clubs and teams, Defendant started its own leagues. Defendant's hockey clubs' teams compete in Defendant's leagues, and parents pay the exorbitant league fees as part of their club dues. Defendant currently operates four leagues: the Atlantic Hockey Federation, the Atlantic Girls Hockey Federation, THF and NGHL. According to Defendant's website, more than 20,000 players from more than 1280 teams participate in Defendant's leagues.[18]

34. Defendant also created a tournament division called Defender Hockey Tournaments. According to Defender's website, it operates in 42 locations, has held 32 tournaments, and has had more than 1,200 teams participate in those tournaments.[19]

35. Although Defender is owned and operated by Defendant, Defender utilizes a different name, logo and website. Perhaps because Defendant recognizes that parents would respond negatively if they knew that their pricey tournament fees are going to the same company that collects their ever-increasing club dues, the "About Us" section of Defender's website fails to mention any connection to Black Bear Sports Group, Inc.[20]

36. Similarly, THF and NGHL also utilize different names, logos and websites, and the "About" sections of the websites do not mention Black Bear Sports Group, Inc.[21]

---

[17] *Id.*
[18] https://blackbearsportsgroup.com/hockeyleagues (last visited Aug. 10, 2026).
[19] https://www.defenderhockeytournaments.com (last visited Aug. 10, 2026).
[20] https://www.defenderhockeytournaments.com/about (last visited Aug. 9, 2026).
[21] https://www.tier1hockeyfederation.com/about (last visited Aug. 25, 2026); https://nghlhockey.com/about (last visited Aug. 25, 2026).

37. Defendant also started a streaming service, Black Bear TV, which "provides live and on-demand coverage of youth, scholastic, high school, college, and USPHL junior hockey games across Black Bear-owned rinks and various third-party venues."[22] Rather than compete with an existing streaming service or parents using their smartphones to videoconference with other family members, Defendant became the exclusive streaming distributor of all games played inside Defendant's arenas and partner venues[23] and reportedly banned parents from "streaming" their own kids' games.[24]

38. Defendant's vertically integrated system became the subject of an inquiry from the Michigan Department of Attorney General.[25]

39. According to a spokesperson, the Michigan Attorney General opened the investigation "out of concern for the risk of consumer harm—including higher prices and reduced service quality—that can arise from diminished access to community and recreational services."[26]

**C. Defendant Utilizes a Stay to Play Policy in Connection with the Tournaments at Issue.**

40. Through its tournament arm, Defender, and two of is leagues, THF and NGHL, Defendant coerces parents to stay in specific partner hotels and book their hotel reservations through a designated platform, a practice commonly referred to as "Stay to Play."

41. According to Defendant, all non-local teams, meaning teams that are based more than 60 or 75 miles from the event (depending on the event), are required to "Stay to Play."

---

[22] https://blackbearsportsgroup.com/blackbeartv (last visited Aug. 9, 2026).
[23] *Id.*
[24] Bryan Llenas, *Parents warn Wall Street is ruining youth hockey* (Nov. 21, 2025), https://www.foxnews.com/video/6385430128112 (last visited Aug. 10, 2026).
[25] *The Big Business Buying Up America's Hockey Rinks*, Wall Street Journal (May 14, 2026), https://www.youtube.com/watch?v=JetP-W5azNA&t=46s (last visited Aug. 8, 2026).
[26] https://www.wmuk.org/wmuk-news/2026-04-28/blackbearag0427 (last visited Aug. 14, 2026).

42. Defendant makes the following statements on the "Hotel Info" page of the Defender website:

a. "As a reminder, Defender events are Stay to Play. All teams are to utilize official event hotels."[27]

b. "Please make sure families only book via the link provided. Families are not to contact the hotel directly to book rooms for the event."[28]

c. "All teams and participants are required to book their hotel accommodations through the tournament's official housing provider."[29]

d. "A condition of being accepted into a Defender event is that ALL teams with a home rink **more than 75 miles** from the tournament rink and require accommodation, **MUST** book rooms through the Defender Tournaments. No other rates (including corporate/ AAA/government rates), discounts, or hotel reward points regardless of how acquired, will be allowed. No exceptions. Rooms must be reserved and booked by six (6) weeks before the event begins. ***Failure to follow and or circumvent procedures and obligations will result in removal from the tournament, forfeiture of tournament fees, and forfeiture of team eligibility for a complimentary room awarded to the team.***"[30]

43. Similarly, THF utilizes a Stay to Play policy for all showcases and playoffs.[31]

44. NGHL events display the Stay to Play policy on the event registration pages. For example, the NGHL Pittsburgh Showcase 2026 registration page states:

---

[27] https://www.defenderhockeytournaments.com/hotels (last visited Aug. 14, 2026).
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] https://nghlhockey.com/nghl-policies (last visited Aug. 25, 2026).

> **NGHL HOTEL POLICY** A condition of being accepted into an NGHL event is that ALL teams (local or traveling) who require accommodation MUST book rooms through the NGHL. No other rates (including corporate/ AAA/government rates), discounts, or hotel reward points, regardless of how acquired, will be allowed. No exceptions. Read the NGHL Hotel Policy https://nghlhockey.com/hotel-policy
>
> To learn more about our event policies, visit https://nghlhockey.com/nghl-policies[32]

45. The "NGHL Policies" include the following statement in bold under "Other Requirements:" "**Teams must stay in the hotels provided by NGHL Hockey.**"[33]

46. Defendant benefits from this arrangement because it gains an additional revenue stream by tying hotel stays to tournament participation and receiving commissions or "rebates" from the partner hotels and/or partner reservation platforms.[34]

47. Parents of tournament and event participants, on the other hand, do not benefit from Stay to Play policies. Profit-seeking entities that operate in the Stay to Play ecosystem, including Defendant, are driving up costs for parents and limiting access by pricing out many young athletes.[35]

48. Coercing families into staying in particular hotels, making hotel reservations through a specific platform, and paying junk fees in connection with those reservations all constitute "vulture practices" that are the subject of the Let Kids Play Act.

---

[32] https://my.nghlhockey.com/events/3f2b6b74-e58e-4811-b7a8-214985be8c0f (last visited Aug. 25, 2026).
[33] https://nghlhockey.com/nghl-policies (last visited Aug. 22, 2026).
[34] *Id.*
[35] Jamal Walker, *As cost of youth sports grows, Congress eyes regulation of private equity*, Cronkite News (July 22, 2026), https://cronkitenews.azpbs.org/2026/07/22/youth-sports-private-equity/ (last visited July 23, 2026.

**D. Parents Paid Inflated Hotel Rates due to Defendant's Stay to Play Policy.**

49. Not only are parents told that they must stay in pricey hotels when they may prefer more affordable lodging options, such as staying with family or friends, camping or renting an RV, renting a home or apartment via Airbnb or Vrbo, or staying in a hostel, motel, or bed and breakfast, but parents who reserve hotel rooms through Defendant's partner booking platform are often charged higher rates than if they booked the same room directly with the hotel.

50. For example, as shown in Figure 1 below, on August 14, 2026, Defendant's partner reservation platform offered rooms at the DoubleTree by Hilton Fairfield Hotel & Suites in Fairfield, New Jersey in connection with the "Defender College Exposure Showcase" tournament for $199.00 per night from October 9 through 12, 2026.




Fig. 1.

51. Parents could save $10.00 per night by reserving a comparable room directly with the DoubleTree by Hilton Fairfield Hotel & Suites in Fairfield, New Jersey, and could save an additional $25.00—for a total savings of $55.00 for three nights—by entering their email address and agreeing to receive occasional special offers via email. Figure 2 is a screenshot taken on August 14, 2026, showing that a fully refundable room with 2 Queen beds from October 9 through 12, 2026, was available for $189.00 per night directly through the Doubletree website.




Fig. 2.

52. Similarly, as shown in Figure 3 below, on August 20, 2026, Defendant's partner reservation platform offered rooms at the Comfort Inn Mechanicsburg - Harrisburg South in Harrisburg, Pennsylvania in connection with the "Columbus Day Invitational (Hershey, PA)" tournament for $179.00 per night from October 9 through 12, 2026.




Fig. 3.

53. Parents could save $25.00 per night by reserving a comparable room directly with the Comfort Inn Mechanicsburg - Harrisburg South in Harrisburg, Pennsylvania. Figure 4 is a screenshot taken on August 20, 2026, showing that a room with 2 Queen beds from October 9 through 12, 2026, and free cancellation until October 6, 2026, was available at the Comfort Inn Mechanicsburg - Harrisburg South for $154.00 per night directly through the Comfort Inn website.




Fig. 4.

54. Parents of competitive hockey players cannot simply opt out of tournaments to avoid Defendant's Stay to Play policy. Athletes who do not attend tournaments and events with their team risk being cut from the team or being benched for their failure to attend mandatory events. Additionally, high school athletes who do not participate in college showcase tournaments miss opportunities to be scouted for college scholarship opportunities. Thus, parents are faced with the difficult choice of complying with Defendant's Stay to Play policy or pulling their children from travel hockey programs.

**E. Defendant Deceives Consumers About Its Stay to Play Policy.**

55. Defendant misrepresents its Stay to Play policy to consumers by falsely telling parents that all players on non-local teams, without exception, must abide by the Stay to Play policy.

56. In reality, not every athlete must comply with the Stay to Play mandate to participate in Defender tournaments and league events. Defendant's policy is that 80% of the players on each team must comply with the policy, but Defendant falsely tells ***all*** parents of non-local players that they must make reservations at particular hotels via the designated platform.

57. Additionally, Defendant intentionally fails to disclose that there is a buyout option, meaning parents who do not want to stay in the designated hotels have the ability to pay a "buyout fee" to circumvent the Stay to Play policy.

58. Despite the fact that Defender tournaments do not require 100% Stay to Play compliance, Defendant falsely and explicitly tells parents that there are "No exceptions" to the policy, leading reasonable consumers to believe that they have no choice but to submit to Defendant's unfair practice of dictating where they stay and which platform they use to reserve their rooms.

**F. Defendant Charges Parents Junk Fees During the Online Booking Process.**

59. In addition to coercing parents into booking hotel reservations at specific hotels through a particular booking platform and misrepresenting its Stay to Play policy, Defendant imposes two inadequately disclosed junk fees in connection with each reservation.

60. The booking confirmation emails lump these two fees into one "Tax, Recovery Charges, and Service Fees" line item on the "Rate Summary Agreed To at Checkout."

61. One of the fees is simply referred to as a non-refundable fee with no indication of why parents are being charged or what, if anything, parents receive in return for paying this fee. On information and belief, parents receive nothing in return for this fee.

62. The second fee is described as follows: "This discount rate requires a 20.00 USD (USD) payment at time of reservation and will appear on your credit card under Defender Hockey."

As stated above, however, parents are not actually receiving a discounted rate, so they do not receive anything in exchange for paying this fee.

63. Both fees are charged by Defendant even though the reservations appear to be made via a third-party platform.

**G. Defendant's Stay to Play Policy is Unfair.**

64. Defendant engaged in conduct that unfairly injured hockey parents in connection with its Stay to Play policy because: (a) Defendant caused substantial monetary harm to consumers (in the form of both higher hotel rates and junk fees); (b) the conduct was not outweighed by any countervailing benefits to consumers or competition; and (c) parents could not reasonably have avoided the higher rates and junk fees because Defendant told parents that their cooperation with Defendant's Stay to Play policy was a condition of their children's participation in the Tournaments at Issue.

65. There is no countervailing benefit to consumers that outweighs the consumer harm caused by Defendant's conduct. Parents who are capable of managing their children's travel hockey schedules are capable of making their own lodging reservations. Teams, clubs, or individual parents are able to reserve hotel blocks on their own if they would like to stay in the same hotel.

66. There is no countervailing benefit to competition that outweighs the consumer harm caused by Defendant's conduct. To the contrary, Defendant's practice of telling consumers that they are required to book stays at specific hotels via a particular platform had the effect of restraining competition for short-term lodging near the Tournaments at Issue during and around the event dates.

67. As demonstrated in Figures 1 through 4 above, many hotels affiliated with Defendant were able to charge higher prices to consumers booking via Defendant's designated platform and did in fact charge higher prices because Defendant's Stay to Play policy had the effect of creating a captive market for hotels that partnered with Defendant and/or Defendant's booking platform.

68. Because consumers reasonably believed Defendant's representation that there were "No exceptions" and that every athlete must stay in a hotel reserved through the designated platform in order for their children to participate in the Tournaments at Issue, they were coerced into making hotel reservations and paying junk fees plus higher rates than they would have if Defendant did not utilize a Stay to Play policy.

69. The higher rates and junk fees were unavoidable due to Defendant's Stay to Play policy. Had Defendant not utilized this unfair policy, families could have explored alternate, more affordable lodging options, such as staying with family or friends, camping or renting an RV, renting a home or apartment via Airbnb or Vrbo, or staying in a hostel, motel, or bed and breakfast. None of those alternate options would have included the junk fees that they paid to Defendant.

70. Defendant's practice of charging junk fees violates established public policy. Former President Biden announced his initiative to reduce or eliminate junk fees in 2022.[36]

71. Defendant's practices as set forth herein were and are immoral, unethical, oppressive, and unscrupulous. By coercing parents to make hotel reservations through an affiliated platform and imposing junk fees with each reservation, which did not benefit consumers,

[36] https://www.presidency.ucsb.edu/documents/white-house-press-release-the-presidents-initiative-junk-fees-and-related-pricing (last visited Aug. 25, 2025).

Defendant willfully deceived hockey parents and enriched itself at the cost of Plaintiffs and members of the Classes.

**H. Defendant Knowingly, Willfully, and Intentionally Harms Thousands of Hockey Parents.**

72. According to the Defender website, Defender has hosted 32 tournaments in 42 locations with 1,200+ participating teams.[37]

73. Defendant's THF website states that the league operates in 14 states and includes 50+ organizations, 270+ teams, and 4,000+ players.[38] There are nine showcase events scheduled during the 2026-2027 season,[39] all of which are Stay to Play events.[40]

74. Defendant's NGHL website includes a section titled "NGHL BY THE NUMBERS," which states that NGHL operates in 46 states, includes 76+ organizations, 596+ teams, and 6,470+ players.[41] The same website shows 13 NGHL events for the 2026-2027 season,[42] all of which are Stay to Play events.[43]

75. Because Defendant's mandatory, non-refundable junk fees are applied to every reservation, on information and belief Defendant collects hundreds of thousands of dollars from hockey parents each year though junk fees alone.

---

[37] https://www.defenderhockeytournaments.com (last visited Aug. 25, 2026).
[38] https://www.tier1hockeyfederation.com (last visited Aug. 25, 2026).
[39] https://www.tier1hockeyfederation.com/showcases (last visited Aug. 25, 2026).
[40] https://www.tier1hockeyfederation.com/nhshowcase-2026 (last visited Aug. 25, 2026); https://www.tier1hockeyfederation.com/ctshowcase-nov-26 (last visited Aug. 25, 2026); https://www.tier1hockeyfederation.com/pittshowcase-26 (last visited Aug. 25, 2026); https://www.tier1hockeyfederation.com/hersheyshowcase-26 (last visited Aug. 25, 2026); https://www.tier1hockeyfederation.com/ctshowcase-december (last visited Aug. 25, 2026); https://www.tier1hockeyfederation.com/phillyshowcase (last visited Aug. 25, 2026); https://www.tier1hockeyfederation.com/pittshowcase-2027 (last visited Aug. 25, 2026); https://www.tier1hockeyfederation.com/phillyshowcase-2027 (last visited Aug. 25, 2026); https://www.tier1hockeyfederation.com/ctshowcase-january (last visited Aug. 25, 2026).
[41] https://nghlhockey.com (last visited Aug. 22, 2026).
[42] *Id.*
[43] https://nghlhockey.com/nghl-policies (last visited Aug. 22, 2026).

76. Tens of thousands, if not hundreds of thousands, of parents each year are harmed by Defendant's knowing and intentional deceptive, unfair, and unconscionable practices. Consumer victims are parents of hockey players who reserved hotel rooms through Defendant's partner booking platform in connection with the Tournaments at Issue.[44]

77. Defendant knowingly and willfully deceived consumers, including Plaintiffs and the Classes (as defined below), because, among other reasons and as otherwise detailed in this Complaint, Defendant knowingly and willfully misrepresented that parents were required to book hotel stays in particular hotels via a designated platform in order for their children to participate in the Tournaments at issue and omitted the material facts that not every player needs to comply with the policy and that there is a buyout fee option.

78. Defendant made these representations and omissions despite knowing that not every player on a team was required to Stay to Play for the team to participate in the Tournaments at Issue. Defendant continues to engage in these deceptive practices.

79. Defendant has acted with malice because, among other reasons and as otherwise detailed in this Complaint, Defendant's conduct was despicable and done with a willful and knowing disregard of the rights of the public, Plaintiffs, and the members of the Classes because Defendant knew (or should have known) that its misrepresentations and omissions regarding its Stay to Play policy are illegal, but engaged in the deceptive and unfair conduct that injured Plaintiffs and members of the Classes anyway.

80. Defendant's conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiffs and members of the Classes to cruel and unjust hardship in knowing disregard of their rights, including by falsely

---

[44] *Id.*

telling them that they all had no choice but to book hotel stays via a designated platform if they wanted their children to be able to participate in the Tournaments at Issue.

81. Defendant's conduct was fraudulent because, among other reasons and as otherwise detailed in this Complaint, Defendant (a) falsely told all Plaintiffs and members of the Classes that they must book rooms at particular hotels via a designated platform in order for their children to participate in the Tournaments at Issue, (b) misrepresented the Stay to Play policy to Plaintiffs and members of the Classes, and (c) omitted material facts regarding the quota and buyout option related to its Stay to Play policy.

## NAMED PLAINTIFFS' ALLEGATIONS

*Plaintiff Gary Oliver*

82. Plaintiff Gary Oliver is a resident of Delaware and the father of a competitive hockey player.

83. Plaintiff Gary Oliver was told that the team would not be allowed to participate in certain hockey events if he did not make hotel reservations at specific hotels because the events were Stay to Play events.

84. One of the Stay to Play events that Plaintiff Gary Oliver's child participated in was the Defender Columbus Day Connecticut tournament in Cromwell and Bolton, Connecticut (near Hartford), which was held on October 8-10, 2022.

85. Because he believed he needed to comply with the Stay to Play policy, Plaintiff Gary Oliver made a reservation at Comfort Inn & Suites East Hartford - Hartford for three nights on October 7-10, 2022. He agreed to pay $199.00 per night for the hotel stay when he made the reservation on August 18, 2022.

86. In addition to the hotel rate and applicable government taxes, Plaintiff Gary Oliver was charged fees by Defender when he made the reservation. Plaintiff Gary Oliver did not receive anything in return for paying those fees.

87. According to the confirmation email that Plaintiff Gary Oliver received immediately after he made the hotel reservation, he was charged $66.00 by Defender at the time he made the hotel reservation. Including these fees imposed by Defendant, the reservation for the three-night stay totaled $683.55.

88. Another Stay to Play event that Plaintiff Gary Oliver's child participated in was the President's Cup in New Jersey, which was held on February 15-17, 2025.

89. Because he and his wife believed they needed to comply with the Stay to Play policy, Plaintiff Gary Oliver's wife made a reservation at a Hilton for two nights on February 14-15, 2025. She agreed to pay $159.00 per night for the hotel stay when she made the reservation on or around November 6, 2024.

90. In addition to the hotel rate and applicable government taxes, Plaintiff Gary Oliver's wife was charged a fee by Defender when she made the reservation. Neither Plaintiff Gary Oliver nor his wife received anything in return for paying that fee. The fee was paid using a credit card account shared by Plaintiff Gary Oliver and his wife.

91. According to the confirmation email that Plaintiff Gary Oliver's wife received immediately after she made the hotel reservation, she was charged $6.00 by Defender at the time she made the hotel reservation. Including the fee imposed by Defendant, the reservation for the two-night stay totaled $364.49.

92. Pursuant to Defendant's Stay to Play policy, Plaintiff Gary Oliver believed he had no choice but to make a hotel reservation as directed if he wanted his child to be able to participate

in these tournaments. Not participating in the tournaments was not an option because doing so would place his child's status on the hockey team at risk.

93. Plaintiff Gary Oliver would not have reserved hotel rooms via the platform affiliated with the tournaments had Defendant not imposed a Stay to Play policy. Plaintiff Gary Oliver is a Hilton Honors Diamond Member and would have preferred to stay in nicer hotels such as Hilton hotels for every tournament and would have preferred to reserve his rooms directly through Hilton.

94. Plaintiff Gary Oliver's child still plays competitive hockey and participates in hockey tournaments, and Plaintiff Gary Oliver is at risk of suffering further harm by Defendant if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiffs Scott and Jennifer Wachterhauser*

95. Plaintiffs Scott and Jennifer Wachterhauser are residents of New Jersey and the parents of a competitive hockey player. They travel with their child to attend hockey tournaments.

96. Plaintiffs Scott and Jennifer Wachterhauser were told that the team would not be allowed to participate in certain hockey events if they did not make hotel reservations at specific hotels because the events were Stay to Play events.

97. One of the Stay to Play events that Plaintiffs Scott and Jennifer Wachterhauser's child is scheduled to participate in is the Defender Columbus Day Invitational, which is an event that is scheduled to be played in the Hershey, Pennsylvania area on October 10-12, 2026, at the Twin Ponds Arena, Klick Lewis Arena, and York Ice Arena. All three of these arenas are owned by Defendant. According to the tournament website, the event is sold out.[45]

---

[45] https://www.defenderhockeytournaments.com/event/columbus-day-pa-26 (last visited Aug. 27, 2026).

98. Because she believed she needed to comply with the Stay to Play policy, Plaintiff Jennifer Wachterhauser made a reservation at Comfort Suites Camp Hill-Harrisburg West in Camp Hill, Pennsylvania for three nights from October 9-12, 2026. She agreed to pay $214.00 per night for the hotel stay when she made the reservation on July 8, 2026. She made this reservation through a platform that she accessed via a reservation link that was associated with the Defender tournament.

99. In addition to the $214.00 nightly hotel rate and applicable government taxes, Jennifer Wachterhauser was charged fees by Defender when she made the reservation. Plaintiffs Scott and Jennifer Wachterhauser did not receive anything in return for paying those fees.

100. According to the confirmation email that Plaintiff Jennifer Wachterhauser received immediately after she made the hotel reservation, she was charged $21.00 by Defender at the time she made the hotel reservation. Including these fees imposed by Defendant, the reservation for the three-night stay totaled $723.24.

101. On the evening of August 27, 2026, the mobile version of the Choice Hotels website showed that average rates for rooms at Comfort Suites Camp Hill-Harrisburg West in Camp Hill, Pennsylvania were $299.00 per room on October 9, 2026, $179.00 per room on October 10, 2026, and $172.00 per room on October 11, 2026. Because of the fees imposed by Defender, Plaintiff Jennifer Wachterhauser paid more to book her hotel stay via Defendant's partner reservation platform than she would have paid if she had reserved the same room directly through the Choice Hotels mobile website.

102. Additionally, when Plaintiff Jennifer Wachterhauser booked her reservation at Comfort Suites Camp Hill-Harrisburg West through Defendant's partner platform, she accidentally selected a room with a single bed. When she contacted Defendant's partner platform to change the

reservation, she was informed that she could not change the room type but instead needed to cancel her original reservation and make a new reservation. She was only credited with $15.00 rather than the entire $21.00 that she paid to Defender at the time she made her original reservation. She was charged $21.00 in fees by Defender a second time when she made her new reservation with more than one bed, meaning she paid a total of $27.00 in fees to Defender in connection with this hotel stay. Had she booked her stay directly through Choice Hotels, she would not have had to pay any fees to Defender.

103. As of August 27, 2026, the platform hotels.com offered a number of more affordable hotel options in the same vicinity for three-night stays on the same dates. The hotel rooms that were available on hotels.com on August 27, 2026, in the Camp Hill area from October 9-12, 2026, include:

| Hotel Name | Nightly Rate | Total w/ taxes & fees | Hotel Rating |
|---|---|---|---|
| Crowne Plaza Harrisburg – Hershey by IHG | $ 191.00 | $ 635.00 | 8.0 – Very Good |
| Scottish Inns Harrisburg – Hershey South | $ 58.00 | $ 194.00 | 7.2 – Good |
| Holiday Inn Express Hotel & Suites Harrisburg West by IHG | $ 209.00 | $ 696.00 | 8.8 – Excellent |
| Comfort Inn Mechanicsburg – Harrisburg South | $ 154.00 | $ 513.00 | 8.0 – Very Good |
| Quality Inn Enola – Harrisburg | $ 86.00 | $ 285.00 | 7.6 – Good |
| Spark by Hilton Mechanicsburg | $ 171.00 | $ 571.00 | 8.4 – Very Good |
| stayAPT Suites Harrisburg – Hershey | $ 159.00 | $ 529.00 | 8.2 – Very Good |
| Home2 Suites by Hilton Mechanicsburg | $ 185.00 | $ 618.00 | 9.4 – Exceptional |
| La Quinta Inn & Suites by Wyndham Mechanicsburg – Harrisburg | $ 138.00 | $ 461.00 | 7.6 – Good |
| Country Inn & Suites by Radisson, Harrisburg – Hershey West, PA | $ 177.00 | $ 591.00 | 9.0 – Wonderful |
| Best Western Premier The Central Hotel & Conference Center | $ 216.00 | $ 718.00 | 9.6 – Loved by guests |

104. Pursuant to Defendant's Stay to Play policy, Plaintiffs Scott and Jennifer Wachterhauser believed that they had no choice but to make a hotel reservation as directed if they wanted their child to be able to participate in the tournament. Not participating in the tournament was not an option because doing so would place their child's status on the hockey team at risk.

105. Plaintiff Jennifer Wachterhauser would not have reserved a hotel room via the platform affiliated with the tournament had Defendant not utilized a Stay to Play policy. Instead, Plaintiffs Scott and Jennifer Wachterhauser would have shopped around using platforms such as expedia.com, hotels.com or kayak.com.

106. Plaintiff Scott Wachterhauser usually uses expedia.com to book travel and generally has points available to use to obtain discounted rates. In comparing rates between other platforms and Defendant's affiliated reservation platform, Plaintiff Scott Wachterhauser has noticed that the rates through other platforms are always cheaper than what is offered through Stay to Play tournaments.

107. Plaintiffs Scott and Jennifer Wachterhauser's child still plays competitive hockey and participates in hockey tournaments, and they are at risk of suffering further harm by Defendant if it continues engaging in the deceptive and unfair practices described herein.

*Plaintiff Brendan Kane*

108. Plaintiff Brendan Kane is a resident of New York and the father of a competitive hockey player.

109. Plaintiff Brendan Kane was told that the team would not be allowed to participate in certain hockey events if he did not make hotel reservations at specific hotels via particular platforms because the events were Stay to Play events.

110. One of the Stay to Play events that Plaintiff Brendan Kane's child participated in was the Defender St. Patty's Smackdown, Delaware, which was hosted at the Patriot Ice Center, in Newark, Delaware on March 8-10, 2024. The Patriot Ice Center is owned by Defendant.

111. Because he believed he needed to comply with the Stay to Play policy, Plaintiff Brendan Kane made a reservation at the Embassy Suites By Hilton Newark Wilmington South for two nights from March 8-10, 2024. He agreed to pay $199.00 per night for the hotel stay when he made the reservation on January 24, 2024.

112. In addition to the hotel rate and applicable government taxes, Plaintiff Brendan Kane was charged fees by Defender when he made the reservation. Plaintiff Brendan Kane did not receive anything in return for paying those fees.

113. According to the confirmation email that Plaintiff Brendan Kane received immediately after he made the hotel reservation, he was charged $26.00 by Defender at the time he made the hotel reservation. Including these fees imposed by Defendant, the reservation for the 2-night stay totaled $445.58.

114. Another Stay to Play event that Plaintiff Brendan Kane's child participated in was the Defender Thanksgiving Classic, Delaware, which was hosted at the Patriot Ice Center, in Newark, Delaware on November 29-December 1, 2024.

115. Because he believed he needed to comply with the Stay to Play policy, Plaintiff Brendan Kane made a reservation at the Springhill Suites By Marriott Newark Downtown for two nights from November 29-December 1, 2024. He agreed to pay $199.00 per night for the hotel stay when he made the reservation on August 12, 2024.

116. In addition to the hotel rate and applicable government taxes, Plaintiff Brendan Kane was charged fees by Defender when he made the reservation. Plaintiff Brendan Kane did not receive anything in return for paying those fees.

117. According to the confirmation email that Plaintiff Brendan Kane received immediately after he made the hotel reservation, he was charged $46.00 by Defender at the time he made the hotel reservation.

118. Pursuant to Defendant's Stay to Play policy, Plaintiff Brendan Kane believed he had no choice but to make hotel reservations as directed for these two tournaments if he wanted his child to be able to participate. Not participating in the tournaments was not an option because doing so would place his child's status on the hockey team at risk.

119. Plaintiff Brendan Kane would not have reserved hotel rooms via the platform affiliated with the tournament had Defendant not utilized a Stay to Play policy. He would have looked for a more affordable option with comparable or better consumer reviews.

120. Plaintiff Brendan Kane's child still plays competitive hockey and participates in hockey tournaments, and Plaintiff Brendan Kane is at risk of suffering further harm by Defendant if it continues engaging in the deceptive and unfair practices described herein.

## CLASS ALLEGATIONS

121. This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), including, without limitation, Sections (b)(2) and (b)(3) of Rule 23.

122. Plaintiffs seek certification of the following classes (the "Classes"):

**Nationwide Class:** All persons who, during the three (3) years preceding the filing of this action through the present or the date of certification of a class, whichever

is later, booked a hotel room in connection with any of the Tournaments at Issue via the platform designated by Defendant.

**Delaware Subclass:** All Delaware residents who, during the three (3) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room in connection with any of the Tournaments at Issue via the platform designated by Defendant.

**New Jersey Subclass:** All New Jersey residents who, during the six (6) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room in connection with any of the Tournaments at Issue via the platform designated by Defendant.

**New York Subclass:** All New York residents who, during the three (3) years preceding the filing of this action through the present or the date of certification of a class, whichever is later, booked a hotel room in connection with any of the Tournaments at Issue via the platform designated by Defendant.

123. Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class definitions as discovery in this action progresses.

124. The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest, and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel, and non-

attorney employees of their firms; (6) any person who has entered into a valid and enforceable arbitration agreement with Defendant that covers the claims at issue in this action; and (7) the legal representatives, successors, and assigns of any such excluded persons.

125. Numerosity: Plaintiffs are informed and believe that there are tens of thousands, if not millions, of members of the Classes. The Classes are so large that the joinder of all of their members is impracticable. Although the precise number of putative members of the Classes is unknown, the facts on which the calculation of that number depends are presently within the sole control of Defendant and the members of the Classes are ascertainable from Defendant's records.

126. Commonality: Defendant has acted on grounds that apply generally to members of the Classes. Absent certification of the Classes, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Defendant. Numerous common issues of fact and law exist, including, without limitation:

a. Whether Defendant's conduct as detailed in this Complaint is unfair.

b. Whether Defendant's conduct as detailed in this Complaint is unconscionable.

c. Whether Defendant's conduct as detailed in this Complaint constitutes false, misleading, and/or deceptive acts.

d. Whether Defendant was engaged in trade and/or commerce when it told Plaintiffs and members of the Classes that they were required to make hotel reservations through its partner booking platform.

e. Whether Defendant was engaged in trade and/or commerce when it sold Plaintiffs and members of the Classes hotel reservations through its partner booking platform.

f. Whether Defendant was engaged in consumer-oriented conduct when it told

Plaintiffs and members of the Classes that they were required to make hotel reservations through its partner booking platform.

g. Whether Defendant was engaged in consumer-oriented conduct when it sold Plaintiffs and members of the Classes hotel reservations through its partner booking platform.

h. Whether Defendant's actions and conduct constituted transactions for the sale or lease of goods or services to consumers.

i. Whether Defendant makes standardized representations to Plaintiffs and members of the Classes.

j. Whether Defendant's representations to Plaintiffs and members of the Classes regarding the requirement to make hotel reservations through its partner booking platform in order for their children's teams to participate in the Tournaments at Issue were false.

k. Whether Defendant omitted information regarding the requirement to make hotel reservations through its partner booking platform in order for their children's teams to participate in the Tournaments at Issue.

l. Whether Defendant's misrepresentations and omissions were material to Plaintiffs and members of the Classes.

m. Whether Defendant intentionally, knowingly, or recklessly made false representations to Plaintiffs and members of the Classes.

n. Whether Defendant's conduct as detailed in this Complaint caused injury to Plaintiffs and members of the Classes.

o. Whether Defendant's conduct detailed in this Complaint violated the consumer

protection laws of Delaware, New Jersey, and/or New York.

p. Whether Plaintiffs and members of the Classes suffered ascertainable losses of money as a result of Defendant's conduct detailed in this Complaint.

q. Whether Defendant is liable for unjust enrichment.

r. Whether Plaintiffs and members of the Classes are entitled to equitable relief.

s. Whether Plaintiffs and members of the Classes are entitled to damages.

127. **Predominance:** These common issues predominate over individualized inquiries in this action because Defendant's liability can be established as to all members of the Classes as discussed herein.

128. **Typicality:** Plaintiffs' claims against Defendant and experiences with Defendant are typical, if not identical, to the claims and experiences of members of the Classes because, among other reasons, Plaintiffs' claims arise from Defendant's practices that are applicable to all members of the Classes.

129. **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes, as Plaintiffs and each member of the Classes lost money by paying inflated hotel rates to Defendant's partner hotels and mandatory fees to Defendant. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

130. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Classes to recover damages; the damages suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiffs and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

131. Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

### First Cause of Action
### Delaware Consumer Fraud Act, 6 Del. C. §§ 2511–2527 ("DCFA")
***Brought by Plaintiff Gary Oliver on Behalf of Himself and the Nationwide Class Members***

132. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

133. The DCFA was enacted to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within Delaware. 6 *Del. C.* § 2512.

134. The DCFA protects non-residents as well as residents of Delaware.

135. The DCFA includes express language that it "shall be liberally construed and applied to promote its underlying purposes and policies." 6 *Del. C.* § 2512.

136. Plaintiffs Gary Oliver and members of the Nationwide Class, and Defendant are all "persons" as defined by the DCFA. 6 *Del. C.* § 2511.

137. Defendant engaged and continues to engage in the conduct of trade or commerce in part or wholly within Delaware by operating the Tournaments at Issue. Many of the Tournaments at Issue were held in Delaware and/or included Delaware-based teams and players, and Defendant sold hotel reservations at hotels located in Delaware as part of its Stay to Play mandate. Defendant is also scheduled to host the "President's Cup" the weekend of February 13-15, 2027, in Delaware and Maryland.

138. Defendant engaged in the "sale" of hotel reservation services when it induced hockey parents to book hotel reservations at certain hotels via its partner booking platform. Defendant continues to engage in the "sale" of hotel reservation services within the meaning of the DCFA. 6 Del. C. § 2511.

139. The hotel reservation services sold by Defendant constitute "merchandise" as defined by the DCFA. *Id.*

140. Defendant's statements regarding its mandatory Stay to Play policy, including statements contained on its websites, constitute "advertisements" as defined by the DCFA. *Id.*

141. As detailed herein, at all relevant times, Defendant engaged in an "unfair practice" as defined by the DCFA by utilizing a Stay to Play policy in connection with the Tournaments at Issue. *Id.*

142. Hockey parents, including Plaintiff Gary Oliver and members of the Nationwide Class, incurred substantial injury in the form of higher hotel rates and junk fees imposed by Defendant by complying with Defendant's Stay to Play policy, which they were not reasonably

able to avoid because Defendant represented in advertisements that complying with its Stay to Play policy was a condition of participating in the Tournaments at Issue.

143. The substantial injuries suffered by Plaintiff Gary Oliver and members of the Nationwide Class as a result of Defendant's unfair practices were not outweighed by any countervailing benefits to consumers or to competition because: (a) consumers received no benefits in exchange for the inflated rates and junk fees they paid, and (b) competition was harmed by Defendant's Stay to Play policy because consumers were unable to exercise any choice regarding their short-term lodging in connection with the Tournaments at Issue.

144. To assert a claim under the DCFA based on deceptive practices, a plaintiff must allege: (1) that a defendant made a false representation and/or omitted a material fact; (2) that the defendant intended for the plaintiff to rely on the representation or omission; and (3) damages.

145. Defendant deceived consumers, including Plaintiff Gary Oliver and members of the Nationwide Class, by telling them that all players must stay in an affiliated hotel room reserved through a particular platform in order for their children's teams to participate in the Tournaments at Issue. This representation was material to consumers. The representation was false because Defendant does not require that every player on every team stay in an affiliated hotel room and allows teams to participate even when parents do not comply with the Stay to Play policy.

146. Defendant deceived consumers, including Plaintiff Gary Oliver and members of the Nationwide Class, by omitting the material fact that not all players needed to stay in an affiliated hotel room in order for a team to participate in the Tournaments at Issue. Defendant also deceived consumers by omitting material facts regarding a "buyout fee" option that would have enabled parents to circumvent the Stay to Play mandate.

147. Plaintiff Gary Oliver and members of the Nationwide Class reasonably relied on Defendant's false statements that they were all required to make reservations at specific hotels via Defendant's partner booking platform in order for their children's teams to participate in the Tournaments at Issue.

148. Defendant made these misrepresentations and induced parents to comply with its unfair Stay to Play policy despite knowing that Stay to Play policies harm families.

149. If Plaintiff Gary Oliver and members of the Nationwide Class had been aware that they were not in fact required to comply with Defendant's Stay to Play mandate, they would not have reserved hotel rooms through Defendant's partner booking platform and thus would have avoided paying mandatory fees to Defendant on top of inflated hotel rates.

150. Defendant's practices as set forth herein offend public policy, were and are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers. By deceptively coercing parents to make hotel reservations through a deceptive and/or unfair Stay to Play policy, which did not benefit consumers, Defendant willfully deceived its customers and enriched itself at the cost of Plaintiff Gary Oliver and members of the Nationwide Class.

151. Defendant's practices as set forth herein are also offensive to public policy, immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers because they contributed to the rising cost of youth sports, tricked consumers into paying inflated hotel rates and junk fees for which they received no benefit in return, had the effect of restraining competition for short-term lodging near the Tournaments at Issue during and around the event dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for the Tournaments at Issue.

152. As a direct and proximate result of Defendant's violations of the DCFA, Plaintiff Gary Oliver and members of the Nationwide Class suffered ascertainable losses of money as a result of Defendant's deceptive and/or unfair acts or practices described herein as they paid mandatory fees to Defendant and also paid higher prices for the hotel accommodations they reserved through Defendant's partner booking platform compared to other platforms or directly through hotels.

153. At all relevant times, Defendant willfully or knowingly engaged in the deceptive and/or unfair acts and practices described herein.

154. Plaintiff Gary Oliver, on behalf of himself and members of the Nationwide Class, seeks declaratory relief and equitable relief, including a permanent injunction to halt Defendant's violations of the DCFA.

155. Plaintiff Gary Oliver, on behalf of himself and members of the Nationwide Class, further seeks restitution and to recover their actual damages, reasonable attorneys' fees and costs, and any other remedies available to them under the DCFA.

**Second Cause of Action**
**New Jersey Consumer Fraud Act, N.J. STAT. 56:8-1 *et seq.* ("NJ CFA")**
***Brought by Plaintiffs Scott and Jennifer Wachterhauser on Behalf of Themselves and the New Jersey Subclass Members***

156. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

157. Defendant regularly engages in the sale, advertisement, and distribution of consumer services within the State of New Jersey, making it subject to the NJ CFA, N.J. STAT. § 56:8-1 *et seq.*

158. The NJ CFA prohibits any "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise,

misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J. STAT. § 56:8-2.

159. At all relevant times, Plaintiffs Scott and Jennifer Wachterhauser, members of the New Jersey Subclass, and Defendant were "persons" within the meaning of the NJ CFA. N.J. STAT. § 56:8-1(d).

160. Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts it intended others to rely upon in connection with advertising and selling hotel reservations through its partner booking platform in violation of Section 56:8-2 of the New Jersey Statutes as alleged herein.

161. Defendant was engaged in trade or commerce when it offered and sold hotel reservation services to hockey parents, including Plaintiffs Scott and Jennifer Wachterhauser and members of the New Jersey Subclass.

162. Defendant's misrepresentations and omissions in the sale of hotel reservations through its partner booking platform as alleged herein impact the public interest.

163. At all relevant times, Defendant engaged in materially misleading conduct when it told hockey parents, including Plaintiffs Scott and Jennifer Wachterhauser and members of the New Jersey Subclass, that all players must stay in an affiliated hotel room reserved through a particular platform in order for their children's teams to participate in the Tournaments at Issue. This representation was material to consumers. The representation was false because Defendant does not require that every player on every team stay in an affiliated hotel room and allows teams to participate even when parents do not comply with the Stay to Play policy.

164. Defendant deceived consumers, including Plaintiffs Scott and Jennifer Wachterhauser and members of the New Jersey Subclass, by omitting the material fact that not all players needed to stay in an affiliated hotel room in order for a team to participate in the Tournaments at Issue. Defendant also deceived consumers by omitting material facts regarding a "buyout fee" option that would have enabled parents to circumvent the Stay to Play mandate.

165. Defendant's misrepresentations and omissions detailed in this Complaint were likely to mislead reasonable consumers and did in fact mislead Plaintiffs Scott and Jennifer Wachterhauser and members of the New Jersey Subclass.

166. Defendant made these misrepresentations and induced parents to comply with its unfair Stay to Play policy despite knowing that Stay to Play policies harm families.

167. If Plaintiffs Scott and Jennifer Wachterhauser and members of the New Jersey Subclass had been aware that they were not in fact required to comply with Defendant's Stay to Play mandate, they would not have reserved hotel rooms through Defendant's partner booking platform and thus would have avoided paying mandatory fees to Defendant on top of inflated hotel rates.

168. Defendant's practices as set forth herein offend public policy, were and are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers. By deceptively coercing parents to make hotel reservations through a deceptive and/or unfair Stay to Play policy, which did not benefit consumers, Defendant willfully deceived its customers and enriched itself at the cost of Plaintiffs Scott and Jennifer Wachterhauser and members of the New Jersey Subclass.

169. Defendant's practices as set forth herein are also offensive to public policy, immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers

because they contributed to the rising cost of youth sports, tricked consumers into paying inflated hotel rates and junk fees for which they received no benefit in return, had the effect of restraining competition for short-term lodging near the Tournaments at Issue during and around the event dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for the Tournaments at Issue.

170. As a direct and proximate result of Defendant's violations of the NJ CFA, Plaintiffs Scott and Jennifer Wachterhauser and members of the New Jersey Subclass suffered ascertainable losses of money as a result of Defendant's deceptive and/or unfair acts or practices described herein as they paid mandatory fees to Defendant and also paid higher prices for the hotel accommodations they reserved through Defendant's partner booking platform compared to other platforms or directly through hotels.

171. As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which it would not have received if it had not engaged in the violations alleged herein, including by directly receiving fees from Plaintiff Jennifer Wachterhauser and members of the New Jersey Subclass and by receiving rebates from its partner hotels and/or partner reservation platform.

172. Defendant's misrepresentations and omissions in the sale of hotel reservations as alleged herein were unfair because they inequitably enriched Defendant at the expense of Plaintiffs Scott and Jennifer Wachterhauser and members of the New Jersey Subclass.

173. As a result, Plaintiffs Scott and Jennifer Wachterhauser, on behalf of themselves and members of the New Jersey Subclass, seek relief, including but not limited to, refunds of the amounts they paid to Defendant in fees, damages, treble damages, attorneys' fees, and costs pursuant to Sections 56:8-2.11 and 56:8-19 of the New Jersey Statutes.

**<u>Third Cause of Action</u>**
**New York General Business Law § 349 (Deceptive Acts and Practices) ("NY GBL § 349")**
***Brought by Brendan Kane on Behalf of Himself and the New York Subclass Members***

174. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

175. Defendant was engaged in consumer-oriented conduct when it offered and sold hotel reservation services to hockey parents, including Plaintiff Brendan Kane and members of the New York Subclass.

176. At all relevant times, Defendant engaged in materially misleading conduct when it told hockey parents, including Plaintiff Brendan Kane and members of the New York Subclass, that all players must stay in an affiliated hotel room reserved through a particular platform in order for their children's teams to participate in the Tournaments at Issue. This representation was material to consumers. The representation was false because Defendant does not require that every player on every team stay in an affiliated hotel room and allows teams to participate even when parents do not comply with the Stay to Play policy.

177. Defendant deceived consumers, including Plaintiff Brendan Kane and members of the New York Subclass, by omitting the material fact that not all players needed to stay in an affiliated hotel room in order for a team to participate in the Tournaments at Issue. Defendant also deceived consumers by omitting material facts regarding a "buyout fee" option that would have enabled parents to circumvent the Stay to Play mandate.

178. Defendant's misrepresentations and omissions detailed in this Complaint were likely to mislead a reasonable consumer acting reasonably under the circumstances and did in fact mislead Plaintiff Brendan Kane and members of the New York Subclass.

179. Defendant made these misrepresentations and induced parents to comply with its unfair Stay to Play policy despite knowing that Stay to Play policies harm families.

180. If Plaintiff Brendan Kane and members of the New York Subclass had been aware that they were not in fact required to comply with Defendant's Stay to Play mandate, they would not have reserved hotel rooms through Defendant's partner booking platform and thus would have avoided paying mandatory fees to Defendant on top of inflated hotel rates.

181. Defendant's practices as set forth herein offend public policy, were and are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers. By deceptively coercing parents to make hotel reservations through a deceptive and/or unfair Stay to Play policy, which did not benefit consumers, Defendant willfully deceived its customers and enriched itself at the cost of Plaintiff Brendan Kane and members of the New York Subclass.

182. Defendant's practices as set forth herein are also offensive to public policy, immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers because they contributed to the rising cost of youth sports, tricked consumers into paying inflated hotel rates and junk fees for which they received no benefit in return, had the effect of restraining competition for short-term lodging near the Tournaments at Issue during and around the event dates, and deprived consumers of the freedom to choose their hotel accommodations or other type of lodging when they traveled for the Tournaments at Issue.

183. As a direct and proximate result of Defendant's violations of NY GBL § 349, Plaintiff Brendan Kane and members of the New York Subclass suffered ascertainable losses of money as a result of Defendant's deceptive and/or unfair acts or practices described herein as they paid mandatory fees to Defendant and also paid higher prices for the hotel accommodations they

reserved through Defendant's partner booking platform compared to other platforms or directly through hotels.

184. Plaintiff Brendan Kane, on behalf of himself and members of the New York Subclass, seeks to enjoin Defendant from continuing to engage in deceptive acts and to recover actual damages or $50.00 per violation of NY GBL § 349, whichever is greater.

185. As detailed in this Complaint, Defendant willfully or knowingly engaged in the deceptive acts and practices described herein. As such, Plaintiff Brendan Kane, on behalf of himself and members of the New York Subclass, seeks treble damages up to $1,000 per violation of NY GBL § 349.

186. Plaintiff Brendan Kane, on behalf of himself and members of the New York Subclass, further seeks his reasonable attorneys' fees and costs, and any other remedies available to them under NY GBL § 349.

**Fourth Cause of Action**
**Unjust Enrichment**
***Brought in the Alternative to Legal Claims by Plaintiffs on Behalf of Themselves and Nationwide Class Members***

187. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

188. In the alternative, and to the extent that Plaintiffs and members of the Nationwide Class lack an adequate remedy at law, Plaintiffs assert a cause of action for unjust enrichment pursuant to Delaware law on behalf of themselves and members of the Nationwide Class.

189. The mandatory fees paid to Defendant by Plaintiffs and members of the Nationwide Class in connection with every hotel reservation conferred a direct benefit upon Defendant at the expense of Plaintiffs and members of the Nationwide Class.

190. The inflated hotel rates paid by Plaintiffs and members of the Nationwide Class to Defendant's hotel partners conferred an indirect benefit upon Defendant at the expense of Plaintiffs and members of the Nationwide Class because Defendant's hotel partners and/or partner booking platform provided rebates to Defendant.

191. Plaintiffs and members of the Nationwide Class were harmed by the fees they paid directly to Defendant and by the inflated hotel rates they paid to Defendant's hotel partners. The rebates that Defendant's hotel partners and/or partner booking platform provided to Defendant stemmed from the inflated rates that Plaintiffs and members of the Nationwide Class paid due to Defendant's conduct as alleged herein.

192. Defendant appreciated the benefit of both the mandatory fees paid by Plaintiffs and members of the Nationwide Class and the rebates provided by its hotel partners and/or partner booking platform insofar as it was enriched by the fees and rebates it received.

193. There is no justification for the mandatory fees that Defendant charged Plaintiffs and members of the Nationwide Class in connection with reservations that they made as a result of Defendant's deceptive conduct and its unfair Stay to Play policy.

194. There is no justification for Defendant subjecting Plaintiffs and members of the Nationwide Class to inflated rates in connection with reservations that they made as a result of Defendant's deceptive conduct and its unfair Stay to Play policy.

195. Given that Defendant received the mandatory fees in connection with a transaction induced by Defendant's deception related to its unfair Stay to Play policy, it would be inequitable to allow Defendant to retain the benefit of the mandatory fees and rebates without payment to Plaintiffs and members of the Nationwide Class for the value of those fees and rebates.

196. To the extent that legal remedies are inadequate to make Plaintiffs and members of the Nationwide Class whole, Plaintiffs seek equitable relief on behalf of themselves and members of the Nationwide Class.

## **JURY DEMAND**

Plaintiffs are entitled to and respectfully demand a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the Classes seek an Order:

a. Certifying the proposed Classes pursuant to Rule 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b. Declaring that Defendant is financially responsible for notifying the members of the Classes of the pendency of this suit;

c. Declaring that Defendant has committed the violations of law alleged herein;

d. Providing for any and all injunctive relief the Court deems appropriate;

e. Awarding statutory damages in the maximum amount for which the law provides;

f. Awarding monetary damages, including but not limited to any compensatory, incidental, consequential, or treble damages in an amount that the Court or jury will determine, in accordance with applicable law;

g. Providing for any and all equitable monetary relief the Court deems appropriate;

h. Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

i. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

j. Awarding pre- and post-judgment interest to the extent the law allows; and

k. Providing such further relief as this Court may deem just and proper.

DATED: September 1, 2026

/s/ P. Bradford deLeeuw
P. Bradford deLeeuw (DE Bar #3569)
DELEEUW LAW LLC
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
(302) 351-6905 (fax)
brad@deleeuwlaw.com

*Counsel for Plaintiffs*

OF COUNSEL:

Karen Dahlberg O'Connell*
ALMEIDA LAW GROUP LLC
157 Columbus Avenue, 4th Floor
New York, NY 10023
Phone: (347) 395-5666
karen@almeidalawgroup.com

Brandon M. Wise*
Peiffer Wolf Carr
KANE CONWAY & WISE, LLP
One US Bank Plaza
Suite 1950
St. Louis, MO 63101
Phone: (314) 833-4827
bwise@peifferwolf.com

**pro hac vice* application forthcoming